## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **CAJUN GLOBAL LLC,** | ) | |
| **d/b/a CHURCH'S CHICKEN** | ) | |
| **and CAJUN FUNDING CORP.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION FILE NO.** |
| **v.** | ) | _____ |
| | ) | |
| **CHICKEN HUNT, INC. and** | ) | |
| **TONY MILAS,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

### VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs Cajun Global LLC d/b/a Church's Chicken ("Global") and Cajun

Funding Corp. ("Funding") (collectively, "Plaintiffs") bring this Verified

Complaint for Damages and Injunctive Relief against Defendants Chicken Hunt,

Inc. ("Chicken Hunt") and Tony Milas ("Milas") (collectively, "Defendants"), and

state as follows:

1.

Plaintiff Global operates and franchises quick service Church's Chicken®

restaurants ("Church's Chicken® Restaurants") throughout the United States.

Beginning in 2006, Cajun Operating Company, predecessor in interest to Global,

entered into a series of franchise agreements and grants of license with Defendant Chicken Hunt for Chicken Hunt to operate numerous Church's Chicken® Restaurants in Pennsylvania.  Defendant Milas (Chicken Hunt's president) executed a guaranty personally guaranteeing Chicken Hunt's obligations to Global under the franchise agreements and grants of license.  This action relates to three of Chicken Hunt's former Church's Chicken® Restaurants in Pennsylvania.

2.

This is an action to collect amounts due to Global from Defendants pursuant to the franchise agreements, grants of license and guaranties as a result of:  (a) Chicken Hunt's uncured operational defaults at two Church's Chicken® Restaurants; (b) the resulting cross-default for one Church's Chicken® Restaurant; (c) damages resulting from the early termination of the franchise agreements and grants of license subject to this action; and (d) damages resulting directly from Chicken Hunt's unauthorized post-termination operations and infringement at the former Church's Chicken® Restaurants.[1]

---

1   As set forth in more detail, *infra*, there is a mediation provision in the Woodland License.  Accordingly, this Complaint does not seek monetary damages related to the Woodland Restaurant.

3.

This action also seeks to enjoin Defendants from willfully and unlawfully using Plaintiffs' goodwill and reputation as a result of Defendants' pirating of Funding's registered trademarks and service marks (the "Church's Chicken Marks"). As a result of Chicken Hunt's unauthorized, post-termination use of Church's Chicken Marks, Funding also seeks damages from Defendants for such infringement.

4.

All conditions precedent to the institution of this action have been satisfied, discharged, excused, and/or waived.

## THE PARTIES

5.

Plaintiff Global is a Delaware limited liability company with its principal place of business, corporate headquarters, and member all located in Atlanta, Georgia.

6.

Plaintiff Funding is a Delaware corporation with its principal place of business and corporate headquarters located in Atlanta, Georgia. Plaintiff Funding

owns the Church's Chicken Marks.  Funding granted Global the exclusive right to use and sublicense the Church's Chicken Marks in connection with the franchising of Church's Chicken® Restaurants by Global.

7.

Defendant Chicken Hunt, Inc. is a Pennsylvania corporation with its principal place of business in Ottsville, Pennsylvania.  Chicken Hunt can be served with process through its president, Antonio Milas, at 746 Geigel Hill Road, Ottsville Pennsylvania 18942.

8.

Defendant Milas is a citizen and resident of the State of Pennsylvania.  Milas can be served with process at 746 Geigel Hill Road, Ottsville, Pennsylvania 18942.

## JURISDICTION AND VENUE

9.

This Court has subject matter jurisdiction over this action based upon:

(a)     28 U.S.C. § 1332 because Plaintiff Funding is a corporation

incorporated under the laws of the State of Delaware with its principal

place of business and corporate headquarters in Georgia; Plaintiff

Global is a Delaware limited liability company with its principal place

of business, corporate headquarters, and member all located in

Georgia;  Defendant Chicken Hunt is a corporation incorporated

under the laws of the State of Pennsylvania with its principal place of

business in Pennsylvania; Defendant Milas is a citizen of

Pennsylvania; and the amount in controversy (without interest and

costs) exceeds $75,000;

(b)     Section 39 of the Lanham Act, 15 U.S.C. §§ 1121 and 28 U.S.C.

§§ 1331, 1337 and 1338(a), for the claims arising out of

Defendants' violations of Sections 32 and 43(a) of the Lanham Act,

15 U.S.C. §§ 1114 and 1125(a); and

(c)     28 U.S.C. § 1338(b) and the doctrine of supplemental jurisdiction as

codified in 28 U.S.C. § 1367, for the claims arising out of Defendants'

common law unfair competition and Defendants' breaches of written

contracts and other related causes of action.

10.

The exercise of personal jurisdiction over Defendants by this Court is proper

under Georgia's Long Arm Statute (O.C.G.A. § 9-10-91) based on the following

facts (in addition to the other facts alleged in this Complaint):

(a)     Plaintiff Global operates and franchises the Church's Chicken®

Restaurants throughout the United States.  Global's franchise

operations are conducted and supervised from its headquarters located in Atlanta, Georgia;

(b)     Defendants carried on a continuous course of direct communications with Plaintiffs via mail, email, and telephone through Plaintiffs' headquarters in Atlanta, Georgia;

(c)     The course of dealing between Global and its franchisees (including Defendants) shows that decision-making authority is vested in Global's headquarters in Atlanta, Georgia;

(d)     Defendants negotiated with Global in Atlanta, Georgia for (among other things) the acquisition of the long-term franchise agreements with the knowledge that they would benefit from their affiliation with Global;

(e)     Defendants voluntarily entered into the franchise agreements, grants of license, and guaranties with Global, which envisioned continuing and wide-reaching contacts with Global in Georgia, including regulation of their franchised business from Global's headquarters in Atlanta, Georgia;

(f)     Defendants have purposefully availed themselves of the benefits and protection of Georgia law by entering into the franchise agreements, grants of license, and guaranties with Global, all of which expressly

provide that Georgia law will govern any and all disputes; and

(g)     Defendants breached contracts (which were to be performed in

Georgia) by failing to make payments and otherwise performing their

obligations to Global in Georgia pursuant to the franchise agreements,

grants of license, and guaranties.

11.

The exercise of personal jurisdiction over Defendants is also proper based

upon the agreement of the parties in the franchise agreements, grants of license,

and guaranties.

12.

Venue is proper in this Court pursuant to:

(a)     28 U.S.C. § 1391(b)(2); and

(b)     the forum selection clauses agreed to by the parties in the franchise

agreements, grants of license, and guaranty.

## THE UNDERLYING AGREEMENTS

13.

Cajun Operating Company, predecessor in interest to Plaintiff Global,

entered into the following agreements with Defendant Chicken Hunt:

(1)     a Grant of License dated January 14, 2008 for the Church's Chicken

system (the "Church's Chicken System") and for Chicken Hunt to open and continuously operate a Church's Chicken® Restaurant at 5818 Woodland Avenue, Philadelphia, Pennsylvania ("Woodland License"), which incorporated the terms of the November 22, 2006 Franchise Agreement for the Church's Chicken® Restaurant at 5717 N. Broad Street, Philadelphia, Pennsylvania (the "Broad Franchise Agreement"). A true and correct copy of the Woodland License and the Broad Franchise Agreement are attached hereto as Exhibit A and Exhibit B, respectively, and incorporated herein by reference;

(2)     a Franchise Agreement and Grant of License dated June 30, 2009 for Chicken Hunt to develop and continuously operate a Church's Chicken® Restaurant at 1936 McDade Boulevard, Woodlyn, Pennsylvania (the "McDade Franchise Agreement and License"). A true and correct copy of the McDade Franchise Agreement and License are attached hereto as Exhibit C and Exhibit D, respectively, and incorporated herein by reference; and

(3)     a Franchise Agreement dated November 19, 2009 for Chicken Hunt to develop and continuously operate a Church's Chicken® Restaurant at 1000 Easton Road, Wyncote, Pennsylvania (the "Easton Franchise Agreement"). A true and correct copy of the Easton Franchise

Agreement is attached hereto as Exhibit E and incorporated herein by reference.

Each of the forgoing agreements referenced in subparts (1) – (3) of this Paragraph 13 are collectively referred to in this Complaint as the "Franchise Agreements." The Church's Chicken® Restaurants that are the subjects of the Franchise Agreements are collectively referred to in this Complaint as the "Restaurants."

14.

The Restaurants' numbers, locations and commencement dates of the applicable the Franchise Agreements are set forth below:

| Restaurant No. | Restaurant Locations | Date of Franchise Agreement/Grant of License |
|---|---|---|
| Church's Chicken #10422 | 5818 Woodland Avenue Philadelphia, PA | January 14, 2008 |
| Church's Chicken #10540 | 1936 McDade Boulevard, Woodlyn, PA | June 30, 2009 |
| Church's Chicken #10541 | 1000 Easton Road Wyncote, PA | November 19, 2009 |

15.

On October 25, 2006, Global entered into a Guaranty Agreement with Defendant Milas whereby Milas individually, personally and unconditionally

guaranteed to Global the performance of each and every obligation of Chicken Hunt to Global under the Broad Franchise Agreement, which incorporates all of Chicken Hunt's obligations under the Woodland License (the "Woodland Guaranty").  A true and correct copy of the Woodland Guaranty is attached hereto as Exhibit F and incorporated herein by reference.

16.

On June 28, 2009, Global entered into a Guaranty Agreement with Defendant Milas whereby Milas individually, personally and unconditionally guaranteed to Global the performance of each and every obligation of Chicken Hunt to Global under the McDade Franchise Agreement and License (the "McDade Guaranty").  A true and correct copy of the McDade Guaranty is attached hereto as Exhibit G and incorporated herein by reference.

17.

On October 26, 2009, Global entered into a Guaranty Agreement with Defendant Milas whereby Milas individually, personally and unconditionally guaranteed to Global the performance of each and every obligation of Chicken Hunt to Global under the Easton Franchise Agreement (the "Easton Guaranty").  A true and correct copy of the Easton Guaranty is attached hereto as Exhibit H and incorporated herein by reference.

18.

Upon demand from Global, the Guaranties further obligate Defendant Milas to render any payment or performance owed by Chicken Hunt to Global.

## CHICKEN HUNT'S OBLIGATIONS
## UNDER THE FRANCHISE AGREEMENTS

19.

Chicken Hunt is obligated by the terms of the Franchise Agreements to operate each Restaurant in conformity with the uniform standards, specifications and procedures as prescribed by the Church's Chicken® operations manual (the "Manual") or as otherwise provided in writing.

20.

Chicken Hunt is also obligated by the terms of the Franchise Agreements to exclusively use products and supplies that are designated and supplied in accordance with the requirements of the Church's Chicken System.

21.

Chicken Hunt is also obligated by the terms of the Franchise Agreements to constantly maintain and continuously operate each Restaurant in first-class condition in accordance with the requirements of the Church's Chicken System, including promptly and diligently performing all necessary repairs and maintenance.

22.

Chicken Hunt is also obligated by the terms of the Franchise Agreements to have on-site supervision at each Restaurant performed by certified personnel, in accordance with the Church's Chicken System and standards.

23.

To ensure the foregoing uniform operational standards, the Franchise Agreements permit Global to inspect Chicken Hunt's Restaurants at any time and make a report of such inspection.  The Franchise Agreements further obligate Chicken Hunt to cooperate with any inspection performed by Global or its designees.

24.

The Franchise Agreements require that Chicken Hunt pay Global royalty fees and advertising fees in accordance with the terms of the Franchise Agreements.

25.

The Franchise Agreements likewise contain cross default provisions such that if Chicken Hunt defaults under any franchise agreement or license with Global, Chicken Hunt will be in default under any other franchise agreement or license with Global.

26.

The Woodland License between Global and Chicken Hunt provides for an

initial term beginning on January 14, 2008 and expiring on January 14, 2028.

27.

The McDade Franchise Agreement and License between Global and

Chicken Hunt provides for an initial term beginning on June 30, 2009 and expiring

on June 30, 2029.

28.

The Easton Franchise Agreement between Global and Chicken Hunt

provides for an initial term beginning on November 19, 2009 and expiring on

November 24, 2029.

## THE CHURCH'S CHICKEN MARKS

29.

To identify the source, origin and sponsorship of Global's products and

services, Global has employed and caused the Church's Chicken Marks to be used

throughout the United States.  Global and its franchisees have spent hundreds of

millions of dollars advertising and promoting the Church's Chicken® Restaurants,

services and products. This extensive advertising and marketing of the Church's

Chicken products and restaurant services under the Church's Chicken Marks has

had a dramatic impact upon the public, creating widespread recognition and good will.

30.

As a result of such expenditures and efforts by Global and its franchisees, valuable good will has been developed for the Church's Chicken Marks and for the Church's Chicken® Restaurants, products and services which bear the Church's Chicken Marks, and thus, identify Global as their sponsor or source.

31.

Funding owns the registrations for the Church's Chicken Marks.  Funding granted Global the exclusive right to use and sublicense the Church's Chicken Marks in connection with the franchising of Church's Chicken® Restaurants by Global.  Pursuant to Church's Chicken franchise agreements between Global and their franchisees, Global grants its franchisees a limited license and authority to use and display the Church's Chicken Marks, but only in such manner, and at such locations and times, as are expressly authorized by Global.  In no event is a franchisee authorized to use the Church's Chicken Marks after the expiration or termination of its franchise.  Such unauthorized use is expressly prohibited under the terms of all Church's Chicken franchise agreements, including the Franchise Agreements at issue in this case.

32.

Set forth below is an abbreviated listing of the Church's Chicken Marks registered in the United States Patent and Trademark Office, all of which continue to be used by Defendants:

| TRADEMARK | REGISTRATION NUMBER | REGISTRATION DATE |
|---|---|---|
| **CHURCH'S CHICKEN** | 3519711 | 10/21/08 |
| **CHURCH'S CHICKEN Since 1952 & Design** | 2721849 | 6/3/03 |
| **CHURCH'S CHICKEN Since 1952** | 3653765 | 7/14/09 |

33.

Plaintiffs comply with all legal requirements to ensure that Funding retains its exclusive rights with respect to the Church's Chicken Marks.  Under Funding's license agreement with Global, Funding has the right and obligation to protect and defend the Church's Chicken Marks and Global has the duty to notify Funding of any infringement.

34.

In addition to complying with all legal requirements, Plaintiffs take all

reasonable precautions to ensure that Funding retains its exclusive rights with respect to the Church's Chicken Marks and to prevent their unauthorized use. For example, Global educates its franchisees and employees as to the importance of the Church's Chicken Marks and instructs them with regard to the proper use of the Church's Chicken Marks.

35.

Global also instructs its employees to "police" the Church's Chicken Marks; that is, to look for unauthorized use of the Church's Chicken Marks in the business community and report any such use to Global. Additionally, under the terms of their Church's Chicken franchise agreements, Global's franchisees are required to notify Global of any infringement or imitation of the Church's Chicken Marks that comes to their attention.

36.

The registrations of the Church's Chicken Marks are currently in full force and effect, and Funding has given notice to the public of the registration of the Church's Chicken Marks as provided in 15 U.S.C. § 1111.

37.

Global's products bearing the Church's Chicken Marks are offered and sold in interstate commerce.

## DEFENDANTS' OPERATIONAL DEFAULTS

38.

On April 22 and July 8, 2015, Global inspected the Easton Restaurant and
gave the restaurant "D" ratings during each inspection.  One of the conditions that
contributed to the "D" rating that the Easton Restaurant received was the fact that
the Restaurant did not have a working air conditioner and the interior temperature
at the Restaurant was 93 degrees.

39.

On April 22, June 16 and August 17, 2015, Global inspected the Woodland
Restaurant and observed serious operational defaults including, without
limitation, dirty equipment, dining areas and restrooms, unapproved products,
failure to follow standard operating procedures, failure to stock packaging and
chicken batter, and failure to maintain safe temperatures in the walk-in cooler.

40.

On April 21, June 16 and August 25, 2015, Global inspected the McDade
Restaurant and observed serious operational defaults including, without
limitation, dirty equipment, unapproved products, failure to follow standard
operating procedures, and failure of employees to dress properly.

41.

Written reports detailing the results of the forgoing inspections of the

Restaurants were given to Defendants.

42.

In addition, and in accordance with the Franchise Agreements, Global sent a letter to Defendants on November 24, 2015, notifying Defendants that they were in default of the Franchise Agreements and Guaranties due to Defendants' failure to meet Global's operational standards at the Easton, Woodland and McDade Restaurants (the "Operational Default Letter"). A true and correct copy of the Operational Default Letter is attached hereto as Exhibit I and incorporated herein by reference.

43.

The Operational Default Letter specifically itemized each of the existing operational defaults observed at the Easton, Woodland and McDade Restaurants.

44.

The Operational Default Letter demanded that Defendants cure all operational problems and be in full compliance with the operational standards described in the Manual within 30 days of the date thereof (or by December 24, 2015).

45.

The Operational Default Letter further explained that should the specified defaults remain uncured at any Restaurant on or after December 24, 2015, then

Global could terminate the Franchise Agreements and enforce any and all of its rights under the Franchise Agreements and Guaranties.

46.

On or about December 30, 2015, in accordance with its rights under the Franchise Agreements, a Global representative inspected the Woodland and McDade Restaurants.  The December 30, 2015 inspection revealed that many of the operational defaults had not been cured at the Woodland and McDade Restaurants, and in fact additional operational defaults were discovered.

47.

For example, during the December 30, 2015 inspection of the Woodland Restaurant, Global observed many ongoing operational defaults including, without limitation, the absence of a certified manager on duty, failure to utilize safety equipment and supplies, failure to keep dining areas, kitchen area and restrooms clean, presence of unapproved products, presence of broken equipment including a broken hot water heater, and failure to follow approved food preparation procedures.

48.

Likewise, during the December 30, 2015 inspection of the McDade Restaurant, Global observed many ongoing operational defaults including, without limitation, the absence of a certified manager on duty, failure to utilize safety

equipment and supplies, failure to keep equipment and restrooms clean, presence of unapproved products, failure to follow approved food preparation procedures, and failure of employees to dress properly.

49.

As a result of the uncured serious operational defaults at the Woodland and McDade Restaurants, and in accordance with its rights under the Franchise Agreements, Global terminated the Woodland License and McDade Franchise Agreement and License by letter dated February 12, 2016 (the "Woodland and McDade Termination Letter").  A true and correct copy of the Woodland and McDade Termination Letter is attached as Exhibit J and incorporated herein by reference.

50.

The Woodland and McDade Termination Letter also notified Defendants that early termination of the Woodland License and the McDade Franchise Agreement and License resulted in an obligation by Chicken Hunt to pay $736,899.40 to Global, representing $687,824.40 in future royalties and advertising fund contributions due for the Woodland Restaurant (the Woodland License did not contain a liquidated damages clause) and $49,075.00 in liquidated damages calculated pursuant to Section 19.C in the McDade Franchise Agreement and License.  The Termination Letter demanded that Defendants immediately pay

Global these amounts.

51.

Pursuant to Paragraph 27.B of the Woodland License, the Woodland and

McDade Termination Letter also included a request for mediation as to financial

disputes arising from the Woodland License.

### CHICKEN HUNT'S OBLIGATIONS UPON TERMINATION OF THE FRANCHISE AGREEMENTS FOR THE WOODLAND AND MCDADE RESTAURANTS

52.

Upon termination of the Woodland License and the McDade Franchise

Agreement and License, Chicken Hunt is required to:

(1)     immediately pay Global and its affiliates all sums due and owing

Global or its affiliates pursuant to the Agreements;

(2)     promptly return to Global the Manual, any copies of the Manual, the

training kit (if applicable), and all other materials and information

furnished by Global, including the return in good condition and repair

all computer software, disks, and other electronic storage media;

(3)     continue to abide by the covenants contained in the Franchise

Agreements and to not take any action that violates the covenants;

(4)     discontinue all use of the Church's Chicken Marks in connection with

the Restaurants and any and all items bearing the Marks; remove the

Marks from the Restaurants and from clothing, signs, materials, motor

vehicles, and other items owned or used by Chicken Hunt in the

operation of the Restaurants; cancel all advertising for the Restaurants

that contains the Marks; and take such action as may be necessary to

cancel any filings or registrations for the Restaurants that contain any

Marks;

(5)     make such alterations and modifications to the Restaurants as may be

necessary to clearly distinguish to the public the Restaurants from

their former appearance and also make specific additional changes as

Global may request for that purpose, at Chicken Hunt's expense; and

(6)     furnish to Global (within 30 days after the effective date of

termination) evidence satisfactory to Global of Chicken Hunt's

compliance with the above-listed obligations.

The obligations set forth in subparts (1) – (6) of this Paragraph 52 shall be

collectively referred to in this Complaint as the "Post-Termination Obligations."

53.

By agreeing to these terms, upon termination of the Woodland License and

McDade Franchise Agreement and License, Chicken Hunt specifically agreed to

immediately cease operating its restaurants as Church's Chicken Restaurants and to desist from all use of the Church's Chicken Marks and trade dress.

54.

Further, effectively immediately, upon the respective terminations of the Woodland License and McDade Franchise Agreement and License, Chicken Hunt has no right to use or display the Church's Chicken Marks and no right to operate using the Church's Chicken System at the Woodland Restaurant or McDade Restaurant.

55.

The Woodland License and McDade Franchise Agreement and License further prohibit Chicken Hunt (upon termination) from using any of Plaintiffs' trade secrets and promotional materials, or any mark confusingly similar to the Church's Chicken Marks.

56.

The February 12, 2016 Woodland and McDade Termination Letter demanded that Defendants immediately bring themselves into compliance with the Post-Termination Obligations of the Woodland License and McDade Franchise Agreement and License, including (without limitation) the obligations to: (1) immediately pay Global all sums due and owing to Global pursuant to the respective agreement; (2) immediately cease use of all Church's Chicken Marks

and other confidential and proprietary information; (3) return the Manual and all other confidential materials related to the operation of the franchised business to Global; (4) promptly make such alternations and modifications to the Restaurants as may be necessary to clearly distinguish to the public the Restaurant from its former appearance; and (5) furnish to Global within thirty (30) days, evidence of compliance with these post-termination obligations.  (*See* McDade and Woodland Termination Letter, Ex. J.)

## CHICKEN HUNT'S INFRINGEMENT AND REFUSAL TO COMPLY WITH POST-TERMINATION COVENANTS OF THE FRANCHISE AGREEMENTS

57.

Notwithstanding the February 12, 2016 termination of the Woodland License and Defendants' receipt of the Woodland and McDade Termination Letter, Chicken Hunt continued to operate the Woodland Restaurant until at least February 28, 2016.

58.

Similarly, notwithstanding the February 12, 2016 termination of the McDade Franchise Agreement and License and Defendants' receipt of the Woodland and McDade Termination Letter, Chicken Hunt continued to unlawfully operate the McDade Restaurant until at least March 1, 2016.

59.

Defendants' unlawful post-termination operations of the Woodland and McDade Restaurants were carried out with conscious indifference to their post-termination obligations under the Franchise Agreements.

## CROSS-DEFAULT AND TERMINATION OF
## THE EASTON FRANCHISE AGREEMENT AND GUARANTY

60.

Section 18(A)(16) of the Easton Franchise Agreement permits Global to terminate the same without a cure period when the franchisee, operating principal, or any 5% owner remains in default beyond the applicable cure period under any other agreement with Global or its affiliates, provided that such non-defaulting franchisee had notice of the default and a 30-day opportunity to cure.

61.

Pursuant to the Easton Franchise Agreement, Global possessed the right to immediately terminate Chicken Hunt's Easton Franchise Agreement as a result of Chicken Hunt's failure to cure the specified operational defaults at the Woodland and McDade Restaurants as required under the Woodland License and McDade Franchise Agreement and License.   Specifically, the November 24, 2015 Operational Default Letter provided Defendants with adequate notice of the 30-day

cure period to avoid termination of the Franchise Agreements.

62.

In addition, pursuant to the Easton Franchise Agreement, Global possessed the right to immediately terminate Chicken Hunt's Easton Franchise Agreement as a result of Chicken Hunt's failure to immediately shut down and de-identify the Woodland and McDade Restaurants upon termination of the Woodland License and McDade Franchise Agreement and License.

63.

On March 7, 2016, Global sent a letter to Defendants, notifying them that as a result of Defendants' failure to cure the specified operational defaults at the Woodland and McDade Restaurants and failure to immediately shut down and de-identify those Restaurants upon termination of the Woodland License and McDade Franchise Agreement and License, Defendants were likewise in default of the Easton Franchise Agreement.  Accordingly, by the letter dated March 7, 2016, Global terminated the Easton Franchise Agreement (the "Easton Termination Letter").  A true and correct copy of the Easton Termination Letter is attached hereto as Exhibit K and incorporated herein by reference.

64.

The Easton Termination Letter also notified Defendants that the early termination of the Easton Franchise Agreement resulted in an obligation to pay

-26-

Global $107,770.20 pursuant to the liquidated damages calculation provided in Section 19.C of the Easton Franchise Agreement.

65.

The Easton Franchise Agreement contains the same Post-Termination Obligations as the Woodland License and McDade Franchise Agreement and License.

66.

By agreeing to these Post-Termination Obligations, upon termination of the Easton Franchise Agreement, Chicken Hunt specifically agreed to immediately cease operating its restaurants as Church's Chicken® Restaurants and to desist from all use of the Church's Chicken Marks and trade dress.

67.

Likewise, upon the termination of the Easton Franchise Agreement, Chicken Hunt specifically agreed to immediately cease operating its restaurant as Church's Chicken® Restaurants and to desist from all use of the Church's Chicken Marks and trade dress.

68.

Further, effectively immediately, upon the termination of the Easton Franchise Agreement, Chicken Hunt has no right to use or display the Church's Chicken Marks and no right to operate using the Church's Chicken System at the

Easton Restaurant.

69.

The Easton Franchise Agreement further prohibits Chicken Hunt (upon termination) from using any of Plaintiffs' trade secrets and promotional materials, or any mark confusingly similar to the Church's Chicken Marks.

70.

The March 7, 2016 Easton Termination Letter demanded that Defendants immediately bring themselves into compliance with the Post-Termination Obligations of the Easton Franchise Agreement and License, including (without limitation) the obligations to: (1) immediately pay Global all sums due and owing to Global pursuant to the respective agreement; (2) immediately cease use of all Church's Chicken Marks and other confidential and proprietary information; (3) return the Manual and all other confidential materials related to the operation of the franchised business to Global; (4) promptly make such alternations and modifications to the Restaurants as may be necessary to clearly distinguish to the public the Restaurant from its former appearance; and (5) furnish to Global within thirty (30) days, evidence of compliance with these post-termination obligations. (*See* Easton Termination Letter, Ex. K.)

71.

Notwithstanding the termination of the Easton Franchise Agreement and Defendants' receipt of the Easton Termination Letter, Defendants continue to operate their Easton Restaurant showing a conscious indifference to their post-termination obligations under the Franchise Agreements.

## ONGOING INFRINGEMENT AND
## VIOLATION OF POST-TERMINATION OBLIGATIONS

72.

Notwithstanding the termination of the Easton Franchise Agreements and Defendants' receipt of the Easton Termination Letter, Defendants have failed and refused to cease operating the Church's Chicken at the Easton Restaurant.

73.

Further, notwithstanding the termination of the Franchise Agreements and Defendants' receipt of the Termination Letters, Defendants have failed to remove from the Restaurants many of the Church's Chicken signs and all other items which bear or display the Church's Chicken Marks, name, symbols or slogans.

74.

Chicken Hunt's failure to comply with the Post-Termination Covenants is likely to confuse the public.  As a result, the potential damage to Global's goodwill and reputation is incalculable, and the potential harm to Global is irreparable.

## **DAMAGES**

75.

Under the terms of the Woodland License and Woodland Guaranty,

Defendants are obligated to pay Global the full amount of lost future royalties and

advertising fund contributions owing for the remainder of the License's term (12

years).

76.

Pursuant to Section 19.C of the McDade Franchise Agreement and License

and Section 19.C of the Easton Franchise Agreement (and through the related

Guaranties), and under Georgia law, Defendants are obligated to pay Global

liquidated damages as a result of the early termination of the McDade Franchise

Agreement and License and the Easton Franchise Agreement.

77.

Under the terms of the Franchise Agreements, Defendants also agreed in

writing that if Global utilizes legal counsel in connection with any failure by

Defendants to comply with the franchise agreements, grants of license, or

guaranties, Defendants shall reimburse Global for all expenses incurred, including

(but not limited to) attorneys' fees.  The parties agreed that the Court and not a jury

would determine these amounts.

78.

Defendants also agreed that, in any litigation to enforce the terms of the agreements between Global and Defendants, Global, as the prevailing party, shall be paid by Defendants all costs and expenses, including attorneys' fees, incurred as a result.

79.

The Woodland and McDade Termination Letter demanded that Defendants immediately pay $687,824.40 for lost future royalties and advertising fund contributions, resulting from the early termination of the Woodland License and subsequent closure of the Woodland Restaurant.

80.

The Woodland and McDade Termination Letter demanded that Defendants immediately pay $49,075.00 in liquidated damages resulting from the early termination of the McDade Franchise Agreement and License and subsequent closure of the McDade Restaurant.

81.

The Easton Termination Letter demanded that Defendants immediately pay $107,770.20 in liquidated damages, resulting from the early termination of the Easton Franchise Agreement.

82.

Despite Defendants' obligations under the Franchise Agreements and the Guaranties, and despite Defendants' receipt of both the Woodland and McDade Termination Letter and the Easton Termination Letter, Defendants have failed and refused to pay the damages due and owing to Global.

83.

Defendants are indebted to Global for all monetary damages, including without limitation past and future royalty fees, advertising contributions, liquidated damages and legal fees incurred by Global as a result of Defendants' breaches.

84.

Plaintiffs have engaged undersigned counsel and have agreed to pay counsel reasonable attorneys' fees for all services rendered in this action and otherwise in connection with enforcing the agreements between the parties.

85.

Global in no way breached the Franchise Agreements, and Global has fulfilled each and every obligation it had pursuant to the Franchise Agreement.

86.

In accordance with the terms of the Woodland License, Global is demanding mediation with Defendants in an effort to resolve the amounts owed to Global under the Woodland License.  As such, claims for monetary damages related to the

Woodland License and Guaranty are not yet ripe.

87.

The mediation requirement in the Woodland License does not extend to injunctive relief sought by Global.  Global reserves the right to amend this Complaint and seek additional monetary damages owed by Defendants in the event the parties are unable to successfully resolve the amounts owed under the Woodland License through mediation.

## COUNT I
## BREACH OF THE MCDADE FRANCHISE AGREEMENT
## (OPERATIONAL DEFAULTS AND FAILURE TO PAY DAMAGES)

88.

Plaintiffs incorporate and re-allege the foregoing paragraphs as if fully set forth herein.

89.

The McDade Franchise Agreement and License are enforceable contracts entered into by Global and Chicken Hunt.

90.

Chicken Hunt defaulted under the McDade Franchise Agreement and License by failing to operate the McDade Restaurant in conformity with the uniform standards, specifications and procedures as provided by the Manual and

pursuant to Section 10 of the McDade Franchise Agreement.

91.

Through the Operational Default Letter, Defendants were notified of the specific operational defaults at each Restaurant and that such defaults must be cured within a 30-day cure period in order to avoid termination of the Franchise Agreements.

92.

Despite Chicken Hunt's obligations under the Franchise Agreements, and despite Chicken Hunt's receipt of the Operational Default Letter notifying Defendants of the operational defaults at the McDade Restaurant, Chicken Hunt failed to cure specified operational defaults concerning safety, cleanliness, training and equipment at the McDade Restaurant.

93.

Chicken Hunt's failure to cure the operational defaults upon notice and within the 30-day cure period at the McDade Restaurant is a breach of the McDade Franchise Agreement and License.

94.

On February 12, 2016, based on the foregoing breach of the McDade Franchise Agreement and License, Global terminated the McDade Franchise Agreement and License and sent notification of same to Defendants by and

through the Woodland and McDade Termination Letter.

95.

Through the Woodland and McDade Termination Letter, Global demanded that Chicken Hunt immediately pay liquidated damages in the amount of $49,075.00 pursuant to the terms of the McDade Franchise Agreement and License.

96.

Despite Chicken Hunt's obligations under the McDade Franchise Agreement and License and despite Chicken Hunt's receipt of the Woodland and McDade Termination Letter, Chicken Hunt has failed and refused to pay the damages due and owing to Global.

97.

In addition to the liquidated damages owed by Chicken Hunt to Global for early termination of the McDade Franchise Agreement, Chicken Hunt also owes Global $763.64 in unpaid, past-due royalty fees and advertising fund fees.

98.

Chicken Hunt's failure to pay Global as obligated is a breach of the McDade Franchise Agreement and License.

99.

The forgoing breaches have directly and proximately caused loss and

damage to Global.

100.

Chicken Hunt owes Global $49,838.64, exclusive of legal fees, which is now past due and owing pursuant to the McDade Franchise Agreement and License.

**COUNT II**
**BREACH OF EASTON FRANCHISE AGREEMENT**
**(OPERATIONAL DEFAULTS AND FAILURE TO PAY DAMAGES)**

101.

Plaintiffs incorporate and re-allege the foregoing paragraphs as if fully set forth herein.

102.

The Easton Franchise Agreement is an enforceable contract entered into by Global and Chicken Hunt.

103.

Chicken Hunt breached the cross-default provision of the Easton Franchise Agreement by failing to cure Chicken Hunt's operational defaults at the Woodland and McDade Restaurants within the 30-day cure period set forth in the Operational Default Letter.

104.

The November 24, 2015 Operational Default Letter provided Defendants with sufficient notice of the Restaurants' operational defaults and the related 30-

day cure period to cure such defaults to avoid termination of the Franchise Agreements.

105.

Despite the foregoing notice, Defendants failed to cure the Woodland and McDade Restaurants' operational defaults as set forth in the Woodland and McDade Termination Letter.

106.

Chicken Hunt also breached the cross-default provision of the Easton Franchise Agreement by failing to immediately shut down the Woodland and McDade Restaurants upon termination of Woodland License and McDade Franchise Agreement and License.

107.

On March 7, 2016, by and through the Easton Termination Letter, Global gave Defendants notice that the Easton Franchise Agreement was terminated pursuant to Section 18(A)(16) (without any further opportunity for Defendants to cure) because of Defendants' failure to cure the operational defaults at the Woodland and McDade Restaurants and failure to immediately shut down the same.

108.

As a result of the early termination of the Easton Franchise Agreement,

-37-

Chicken Hunt is obligated to pay liquidated damages in the amount of $107,770.20.

109.

The Easton Termination Letter demanded that Chicken Hunt immediately pay these damages to Global.

110.

Despite Chicken Hunt's obligations under the Franchise Agreements and despite Chicken Hunt's receipt of the Easton Termination Letter, Chicken Hunt has failed and refused to pay the damages due and owing to Global.

111.

In addition to the liquidated damages owed by Chicken Hunt to Global for early termination of the Easton Franchise Agreement, Chicken Hunt also owes Global $2130.70 in unpaid, past-due royalty fees and advertising fund fees.

112.

Chicken Hunt's failure to pay as obligated is a breach of the Easton Franchise Agreement.

113.

The forgoing breaches have directly and proximately caused loss and damage to Global.

114.

Chicken Hunt owes Global $109,900.90, exclusive of legal fees, which is now past due and owing pursuant to the Easton Franchise Agreement.

## COUNT III
## BREACH OF MCDADE AND EASTON FRANCHISE AGREEMENTS
## (CONFIDENTIALITY AND TRADE SECRETS)

115.

Plaintiffs incorporate and re-allege the foregoing paragraphs as if fully set forth herein.

116.

The confidentiality provisions of the Franchise Agreements serve to protect Global's legitimate business interests, including, but not limited to, its trade secrets, confidential business information and its good will and substantial relationships with its franchisees and customers and are reasonably necessary to protect Global's legitimate business interests.

117.

Chicken Hunt has not returned to Global the confidential Manual, recipe books, and kitchen recipe signs for the McDade and Easton Restaurants, as required by the Franchise Agreements.

118.

Chicken Hunt's actions constitute breaches of the confidentiality provisions

of the McDade Franchise Agreement and License and Easton Franchise

Agreement.

119.

These breaches have directly and proximately caused loss and damage to

Global in an amount to be determined at trial.

**COUNT IV**
**BREACH OF MCDADE AND EASTON FRANCHISE AGREEMENTS**
**(POST-TERMINATION OBLIGATIONS)**

120.

Plaintiffs incorporate and re-allege the foregoing paragraphs as if fully set

forth herein.

121.

Defendants have breached the Post-Termination Obligations of Easton

Franchise Agreement by refusing shut down operations, de-identify the Easton

Restaurant from Church's Chicken and comply with the other Post-Termination

Obligations.

122.

Defendants have breached the Post-Termination Obligations of the McDade

Franchise Agreement and License by refusing to de-identify the McDade

Restaurant from Church's Chicken and comply with the other Post-Termination

Obligations.

123.

Defendants' breaches of the Post-Termination Obligation in the McDade Franchise Agreement and License and the Easton Franchise Agreement and related Guaranties have directly and proximately caused loss and damage to Global in an amount to be determined at trial.

## COUNT V
## BREACH OF MCDADE AND EASTON GUARANTIES

124.

Plaintiffs incorporate and re-allege the foregoing paragraphs as if fully set forth herein.

125.

Pursuant to the Guaranty, Milas unconditionally and personally guaranteed to Global the performance of each and every obligation of Chicken Hunt under the Franchise Agreements, including post-termination obligations.

126.

As a result, Milas is responsible for all damages resulting from early termination of the McDade Franchise Agreement and License and the Easton Franchise Agreement in an amount not less than $159,739.54.

127.

Likewise, Milas also owes Global for all damages Global has suffered as a

result of Chicken Hunt's breach (and ongoing breaches) of the confidentiality provisions and post-termination covenants of the Franchise Agreements for the McDade and Easton Restaurants.

128.

Therefore, Milas owes Global an amount not less than $159,739.54 (exclusive of legal fees) which is now past due and owing.

## COUNT VI
## ATTORNEYS' FEES

129.

Plaintiffs incorporate and re-allege the foregoing paragraphs as if fully set forth herein.

130.

The Franchise Agreements provides that if Global utilizes legal counsel in connection with any failure by Defendants to comply with the Franchise Agreements or Guaranties, Defendants shall reimburse Global for all expenses incurred, including (but not limited to) attorneys' fees.  The parties agreed that the Court and not a jury would determine these amounts.

131.

The Franchise Agreements and Guaranties provide that the prevailing party is entitled to its attorneys' fees and costs.  Pursuant to those provisions and

O.C.G.A. § 13-1-11, Global hereby demands that Defendants reimburse it for all costs and expenses (including attorneys' fees) relating to prosecution of this action.

132.

In addition, Defendants have acted in bad faith, caused unnecessary expense and delay, and been stubbornly litigious.  As such, Plaintiffs are entitled to their reasonable attorneys' fees incurred in this litigation pursuant to O.C.G.A. § 13-6-11.

**COUNT VII**
**LANHAM ACT INFRINGEMENT**

133.

Plaintiffs incorporate and re-allege the foregoing paragraphs as if fully set forth herein.

134.

Defendants' acts with respect to the McDade and Easton Restaurants constitute infringements of Funding's registered trademarks and service marks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

**COUNT VIII**
**LANHAM ACT FALSE DESIGNATIONS**

135.

Funding re-alleges Paragraphs 1 through 64 above as if fully set forth herein.

136.

Defendant's acts constitute false designations of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

## COUNT IX
## COMMON LAW TRADEMARK INFRINGEMENT

137.

Plaintiffs incorporate and re-allege the foregoing paragraphs as if fully set forth herein.

138.

Defendants' acts with respect to the McDade and Easton Restaurants constitute unlawful trademark and service mark infringements under the common law.

## COUNT X
## COMMON LAW UNFAIR COMPETITION

139.

Plaintiffs incorporate and re-allege the foregoing paragraphs as if fully set forth herein.

140.

Defendants' acts constitute unfair competition under the common law.

## COUNT XI
## VIOLATION OF GEORGIA'S
## <u>UNIFORM DECEPTIVE TRADE PRACTICES ACT</u>

### 141.

Plaintiffs incorporate and re-allege the foregoing paragraphs as if fully set forth herein.

### 142.

Defendants have misappropriated Global's confidential and proprietary business information, including recipes, methods and systems contained in the Manual by failing to return items after the franchise relationship between the parties ended with respect to the McDade and Easton Restaurants.

### 143.

Such actions cause a likelihood of confusion and misunderstanding as to Defendants' affiliation, connection and association with Global, which no longer exists for the McDade and Easton Restaurants post-termination of the Franchise Agreements for these restaurants.

### 144.

The foregoing conduct is unlawful, unethical and deceitful.

### 145.

Defendants' actions constitute a violation of Georgia's Uniform Deceptive

Trade Practices Act.

146.

These actions have directly and proximately caused loss and damage to

Plaintiffs.

## COUNT XII
## PUNITIVE DAMAGES

147.

Plaintiffs incorporate and re-allege the foregoing paragraphs as if fully set

forth herein

148.

Defendants' conduct related to the McDade and Easton Restaurants shows

willful misconduct, malice, wantonness, or that entire want of care, which would

raise the presumption of conscious indifference of the consequences to Plaintiffs.

## COUNT XIII
## INJUNCTION AND TEMPORARY RESTRAINING ORDER

149.

Plaintiffs incorporate and re-allege the foregoing paragraphs as if fully set

forth herein.

150.

Defendants continue to unlawfully operate a Church's Chicken at the Easton

Restaurant despite the fact that the Easton Franchise Agreement has been terminated.

151.

Defendants continue to use the trademarks and other confidential and proprietary information of Plaintiffs at the Woodland, McDade and Easton Restaurants.

152.

Defendants' actions are resulting in irreparable harm to Plaintiffs, making money damages inadequate.

153.

Plaintiffs will prevail on their claims due to Defendants' trademark infringement and violations of Franchise Agreements for the Woodland, McDade and Easton Restaurants.

154.

As a result, Defendants should be immediately enjoined and restrained from continuing to operate at the Easton Restaurant and from using the trademarks, confidential and other propriety information of Plaintiffs at the Woodland, McDade and Easton Restaurants.

155.

Defendants should further be ordered to de-identify with Plaintiffs at all Restaurant locations, to return the Manual and all other confidential materials to Plaintiffs, and promptly make such alterations and modifications to the Woodland, McDade and Easton Restaurants as may be necessary to clearly distinguish to the public these restaurants from their former appearance.

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

(1)   For temporary restraining orders and/or preliminary and permanent injunctions enjoining Defendants and all persons acting on their behalf, in concert with, or under his control, from:

(a)   manufacturing, packaging, distributing, selling, advertising, displaying, or promoting any product or service bearing any of the Church's Chicken Marks, or any colorable imitation thereof at the Woodland, McDade and Easton Restaurants;

(b)   displaying or using any of the Church's Chicken Marks to advertise or promote the sale of, or to identify, the Woodland, McDade and Easton Restaurants, or any product or service provided therein; and

(c)   making in any manner whatsoever any statement or representation, or performing any act, likely to lead members of the public to believe

that Defendants, the Woodland, McDade and Easton Restaurants, and the products and services provided therein, are in any manner, directly or indirectly, associated, affiliated, or connected with, or licensed, sponsored, authorized, or approved by Plaintiffs.

(2)     For temporary restraining orders and/or preliminary and permanent injunctions directing Defendants and all persons acting on Defendants' behalf, in concert with Defendants, or under Defendants' control, to:

(a)     recall and deliver up to Plaintiffs all signs, banners, labeling, packaging, advertising, promotional, display, and point-of-purchase materials which bear, or make reference to, any of the Church's Chicken Marks, or any colorable imitation of the Church's Chicken Marks from the Woodland, McDade and Easton Restaurants;

(b)     recall and deliver up to Plaintiffs all copies and editions of the Manual that are in Defendants' actual or constructive, direct or indirect, possession, custody or control at the Woodland, McDade and Easton Restaurants, including all supplements and addenda thereto, and all other materials containing restaurant operating instructions, restaurant business practices, or plans of Plaintiffs;

    (c)    allow Plaintiffs, at a reasonable time, to enter the premises of the Woodland, McDade and Easton Restaurants and make whatever changes, including removal of tangible assets, that are necessary to distinguish the premises from their appearance as a Church's Chicken Restaurant;

    (d)    account and pay over to Plaintiffs all gains, profits, and advantages derived by Defendants at the McDade and Easton Restaurants from any trademark and service mark infringement, breach of contract, and unfair competition to the full extent provided for by Section 35 of the Lanham Act, 15 U.S.C. §1117 and by the controlling principles of common law; and

    (e)    unlawfully using or disclosing Plaintiffs' confidential information, including confidential business information and trade secrets, Manual, recipes, product specifications, information, techniques and know-how.

(3)    Pursuant to Section 35 of the Lanham Act, 15 U.S.C. §1117, for money damages, plus three times additional actual damages Plaintiffs have sustained by reason of Defendants' trademark and service mark infringement and unfair competition at the McDade and Easton Restaurants;

(4)    For punitive damages because of the willful nature of Defendants' actions related to the McDade and Easton Restaurants;

(5)    For pre-judgment interest and Plaintiffs' reasonable attorneys' fees incurred in protecting its rights in this action in accordance with the terms of the McDade Franchise Agreement and License and the Easton Franchise Agreement and, because of the willful nature of the infringement, pursuant to Section 35 of the Lanham Act, 15 U.S.C. §1117;

(6)    For compensatory damages and attorneys' fees owing pursuant to the McDade Franchise Agrement, License and Guarnaty and the Easton Franchise and Guaranty due to Defendants' breaches of contract in an amount not less than $159,739.54;

(7)    For money damages, including treble damages for violations of Georgia's Uniform Deceptive Trade Practices Act related to the McDade and Easton Restaurants;

(8)    For an order directing Defendants to file with the Court, and to serve on Plaintiffs' counsel within ten days after service of any injunction or order issued herein, or within such a reasonable time as the Court shall direct, a report, in writing and under oath, setting forth in detail the manner in which Defendants have complied with such injunction or order;

(9)     For all costs, disbursements, and expenses of this action; and

(10)    For all such other relief as this Court may deem just and proper.


Respectfully submitted this 17th day of March, 2016.

SLOTKIN & CAIOLA, LLC


/s/ Anne P. Caiola
Anne P. Caiola
Georgia Bar No. 142639
annie@slotkincaiola.com
F. Robert Slotkin
Georgia Bar No. 653001
bobby@slotkincaiola.com
Elizabeth B. Rose
Georgia Bar No. 558747
elizabeth@slotkincaiola.com
Attorneys for Plaintiffs

118 E. Maple Street
Decatur, GA 30030
404-228-4099 phone
404-228-4610 fax

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

CAJUN GLOBAL COMPANY )
d/b/a CHURCH'S CHICKEN )
and CAJUN FUNDING CORP., )
       )
    Plaintiffs, )
       )    CIVIL ACTION FILE NO.
v. )
       )    _____
CHICKEN HUNT, INC. and )
TONY MILAS, )
       )
    Defendants. )
       )

## VERIFICATION

     The undersigned officer or agent for Cajun Global Company d/b/a Church's

Chicken hereby verifies under penalty of perjury that upon her knowledge and

belief, the within and foregoing allegations in the Verified Complaint for Damages

and Injunctive Relief are true and correct.

     Executed on March 16, 2016.

                     Cajun Global Company,
                     d/b/a Church's Chicken

                     _____
                     BY:   Jillian M. Suwanski
                     Its: Sr. Director and Assoc. General Counsel

*A notary is not required pursuant to 28 U.S.C. § 1746.*

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

CAJUN GLOBAL COMPANY     )
d/b/a CHURCH'S CHICKEN     )
and CAJUN FUNDING CORP.,     )
    )
    Plaintiffs,     )
    )      CIVIL ACTION FILE NO.
v.     )
    )      _____
CHICKEN HUNT, INC. and     )
TONY MILAS,     )
    )
    Defendants.     )
_____)

## VERIFICATION

The undersigned officer or agent for Cajun Funding Corp. hereby verifies

under penalty of perjury that upon her knowledge and belief, the within and

foregoing allegations in the Verified Complaint for Damages and Injunctive Relief

are true and correct.

Executed on March 16, 2016.

Cajun Funding Corp.

BY: Jillian M. Suwanski
Its: Sr. Director and Assoc. General Counsel

*A notary is not required pursuant to 28 U.S.C. § 1746.*